In re the Termination of Parental Rights
to Marquette S., a person under the age of 18:

State of Wisconsin, Petitioner-Respondent,

v.

Bobby G., Respondent-Appellant-Petitioner.

Supreme Court

*No. 2006AP66–NM. Oral argument February 13, 2007.
—Decided June 22, 2007.*

2007 WI 77

(Also reported in 734 N.W.2d 81.)

532

533

For the respondent-appellant-petitioner there were briefs by *James R. Troupis, Paul D. Barbato,* and *Michael Best & Friedrich LLP,* Madison, and oral argument by *James R. Troupis.*

For the petitioner-respondent there was a brief and oral argument by *Adam Levin,* assistant district attorney, with whom on the brief was *E. Michael McCann,* district attorney.

A guardian ad litem brief was filed by *Cynthia A. Lepkowski, Peter M. Koneazny* and the Legal Aid Society of Milwaukee, Inc., and oral argument by Cynthia A Lepowski.

An amicus curiae brief was filed by *Karyn L. Rotker* and *Laurence J. Dupuis,* Milwaukee, on behalf of the American Civil Liberties Union of Wisconsin Foundation.

An amicus curiae brief was filed by *Elizabeth A. Neary, Stephen W. Hayes,* and *The Schroeder Group, S.C.,* Waukesha, and *Carol Gapen, Lynn Bodi, Judith Sperling-Newton,* and *The Law Center for Children and Families,* Madison, on behalf of the American Academy of Adoption Attorneys.

An amicus curiae brief was filed by *Henry J. Plum,* Wauwatosa, on behalf of the Children's Service Society of Wisconsin.

¶ 1. SHIRLEY S. ABRAHAMSON, C.J. This is a review of an unpublished court of appeals decision[1] summarily affirming the dispositional order of the Milwaukee County Circuit Court, Judge Thomas R. Cooper, terminating Bobby G.'s parental rights to his

---

[1] *State v. Bobby G.,* No. 2006AP66–NM, unpublished slip op. (Wis. Ct. App. Apr. 25, 2006).

biological son Marquette. Based on Bobby G.'s admissions and answers to interrogatories, the circuit court granted the State partial summary judgment at the first step of the termination of parental rights proceedings, the fact-finding phase relating to the grounds for termination.[2] The circuit court ruled that Bobby G. had failed to assume parental responsibility for Marquette under Wis. Stat. § 48.415(6) (2003–04)[3] and declared Bobby G. unfit as a parent. At the second step of the termination of parental rights proceedings, the dispositional phase,[4] after hearing testimony, including from Bobby G., the circuit court determined that it was in Marquette's best interests to terminate Bobby G.'s parental rights.

¶ 2.    Bobby G.'s appellate counsel filed a no-merit report in the court of appeals pursuant to Wis. Stat. §§ 809.107(5m) and 809.32(1). The court of appeals, upon review of the no-merit report and the record, adopted the no-merit report and affirmed the order of the circuit court. Bobby G. sought review, and his new pro bono counsel challenges the termination of parental rights before this court.

¶ 3.    Bobby G. primarily raises a constitutional question for review, asking this court to decide that it is unconstitutional to terminate a father's parental rights based on a failure to assume parental responsibility under Wis. Stat. § 48.415(6) when the father did not know of the child's existence until after the petition for

---

[2] In this phase, the parent's rights are paramount. *See Evelyn C.R. v. Tykila S.*, 2001 WI 110, ¶ 22, 246 Wis. 2d 1, 629 N.W.2d 768.

[3] All references to the Wisconsin Statutes are to the 2003–04 version unless otherwise noted.

[4] In this phase, the child's best interests are paramount. *See Evelyn C.R.*, 246 Wis. 2d 1, ¶ 23.

535

termination of parental rights was filed. Bobby G. argues that an unmarried biological father has a constitutionally protected interest in the opportunity to develop a relationship with his child. In the discussion of the constitutional issues, the parties raise, both implicitly and explicitly, the issue of the proper interpretation of § 48.415(6). Because we can resolve the case on statutory grounds, we decline to address the constitutional issues presented by Bobby G. Were the court or any member thereof to interpret the statute as not requiring that an unmarried biological father have the opportunity to develop a relationship with his child after he learns of the existence of the child, the constitutional issue the parties address at length would have to be decided.

¶ 4. In examining whether grounds for termination of parental rights existed in the instant case under Wis. Stat. § 48.415(6), the circuit court did not consider Bobby G.'s efforts to assume parental responsibility for Marquette after he learned he was the biological father but before the grounds for termination were adjudicated. Rather, the circuit court concluded as a matter of law that it need not consider at the grounds phase Bobby G.'s efforts undertaken after the petition for termination was filed, even though Bobby G. did not learn he was Marquette's father until after the petition was filed. The circuit court declared that it would instead consider Bobby G.'s efforts at the dispositional phase.[5] At the dispositional phase, the circuit court held that Bobby G.'s attempts to assume parental responsi-

---

[5] The State contends that Bobby G. did not argue in the circuit court that his conduct after the termination petition was filed was relevant to the partial summary judgment determination, and therefore cannot claim error on review for the circuit court's failure to consider evidence he never tried to offer.

bility were irrelevant before reaffirming that the grounds for termination had been established by clear and convincing evidence.

¶ 5. For the reasons set forth, we hold that in determining whether a party seeking termination of parental rights has proven by clear and convincing

Under our case law, the circuit court had the duty at the fact-finding hearing to find by clear and convincing evidence that all the elements of Wis. Stat. § 48.415(6) had been satisfied. The circuit court cannot be relieved of its duty under the Fourteenth Amendment and chapter 48 to take sufficient evidence to support a finding of the grounds by clear and convincing evidence. *Evelyn C.R.,* 246 Wis. 2d 1, ¶¶ 24, 26. "Due to the severe nature of terminations of parental rights, termination proceedings require heightened legal safeguards against erroneous decisions. . . . [T]he Due Process Clause of the Fourteenth Amendment to the United States Constitution requires that '[i]n order for parental rights to be terminated, the petitioner must show by clear and convincing evidence that the termination is appropriate.' " *Id.,* ¶ 21 (citations omitted). *See also Steven V. v. Kelley H.,* 2004 WI 47 ¶ 21, 271 Wis. 2d 1, 678 N.W.2d 856.

The answers to the interrogatories at the grounds phase and the testimony at the dispositional phase should have alerted the circuit court that there was a dispute about material facts and that the necessary factual basis was not established to justify the partial summary judgment. *Cf.* Wis. Stat. § 48.422(7)(c) (relating to admissions; before accepting an admission of the alleged facts in a termination petition, the circuit court shall "[m]ake such inquiries as satisfactorily establish that there is a factual basis for the admission"); *State v. Lackershire,* 2007 WI 74, ¶ 33, 301 Wis. 2d 418, 734 N.W.2d 23 (relating to § 971.08(1)(b) requiring a circuit court to make "such inquiry as satisfies it that the defendant in fact committed the crime charged" before accepting a guilty plea). A circuit court may receive evidence at the dispositional phase that it might have used to decide the grounds phase. In the instant case, the circuit court continued to view the evidence of Bobby G.'s relationship with Marquette after he learned of the child's existence as irrelevant.

537

evidence that a biological father has failed to assume parental responsibility under Wis. Stat. § 48.415(6), a circuit court must consider the biological father's efforts undertaken after he discovers that he is the father but before the circuit court adjudicates the grounds of the termination proceeding. Thus the circuit court in the instant case proceeded under an erroneous interpretation of the statute. Accordingly, the facts were not fully developed; to the extent facts were developed, these facts and their import are in dispute. The parties disputed whether Bobby G. assumed parental responsibility after he learned of his paternity but before adjudication of the grounds for termination. Accordingly, with facts in dispute, the circuit court erred as a matter of law in granting partial summary judgment. Moreover, Bobby G. requested a jury trial, which the circuit court denied because it erroneously found no material facts or inferences therefrom in dispute. Neither the circuit court nor this court can deprive Bobby G. of a jury trial by deciding the factual dispute.[6]

¶ 6. For the reasons set forth, we reverse the decision of the court of appeals affirming the summary judgment. We remand the cause to the circuit court for a fact-finding hearing in accordance with Wis. Stat. § 48.424 to determine whether grounds exist for termination of Bobby G.'s parental rights to Marquette and, if necessary, for a dispositional hearing in accordance with § 48.427 on whether Bobby G.'s parental rights should be terminated in the best interests of Marquette.

---

[6] A circuit court may direct a verdict in the grounds phase of a termination of parental rights proceeding. *Door County DHFS v. Scott S.*, 230 Wis. 2d 460, 465, 602 N.W.2d 167 (Ct. App. 1999).

I

¶ 7.  Although we have discussed this case as presenting a question of law, we cannot forget that this case affects a little boy whose fate still hangs in the balance. At the heart of this case is a child named Marquette, who was born on August 31, 2003, to Denise W. but has never lived with his mother. Since discharge from the hospital after birth, Marquette has lived exclusively with his foster parents, Dr. Jeffrey and Karen, who are committed to adopting Marquette and have given Marquette extraordinary care. Marquette was born prematurely and has faced serious health problems that have required significant medical attention.

¶ 8.  A CHIPS[7] case was initiated on Marquette's behalf by the Bureau of Milwaukee Child Welfare in September 2003. Denise W. was not married at the time of Marquette's conception and birth, so the State attempted to identify Marquette's biological father. Denise W. initially named Earley S. as Marquette's biological father. On October 3, 2003, the circuit court ordered a genetic test for Earley S., which on November 11, 2003, excluded Earley S. as Marquette's biological father. The following day, Denise W. identified John J., Sr., as another possible father for Marquette. In February 2004, however, John J., Sr., was also excluded as Marquette's biological father. In March 2004, Denise W. named "Bobby" as a potential father. Denise W. did not have a last name or address for "Bobby."

¶ 9.  On April 13, 2004, the Milwaukee County Circuit Court, Judge Kevin Martens, found Marquette to be a child in need of protection and services pursuant to Wis. Stat. § 48.13.

---

[7] CHIPS is an acronym for "child in need of protection or services." *See* Wis. Stat. § 48.13.

¶ 10. On June 16, 2004, the State filed a petition to terminate Denise W.'s parental rights to Marquette, as well as the parental rights of Marquette's biological father.[8] The petition for termination of parental rights named " 'Bobby' and any unknown father" as Marquette's biological father. The Bureau of Milwaukee Child Welfare began efforts to identify and locate "Bobby."

¶ 11. By August 24, 2004, the Bureau of Milwaukee Child Welfare had identified "Bobby" as Bobby G. and served him with a summons for the termination of parental rights proceedings on August 27, 2004. Bobby G. learned about Denise W.'s child only when he was served with the summons.

¶ 12. On November 24, 2004, Bobby G. was adjudicated Marquette's father as a result of court-ordered genetic testing. The termination of parental rights case was then adjourned to January 11, 2005, to allow Bobby G. to obtain counsel.

¶ 13. On January 11, 2005, Bobby G. made a formal appearance in the termination proceedings, contesting the termination and demanding a jury trial. Throughout the termination of parental rights proceedings, Bobby G. emphasized that he wished to exercise his right to a jury trial on the issue of grounds for termination.

¶ 14. As part of the termination of parental rights proceeding, the State submitted the following eleven requests for admissions to Bobby G., and Bobby G. answered "yes" to each:

---

[8] Denise W.'s parental rights to Marquette were terminated, and this review concerns only the termination of Bobby G.'s parental rights to Marquette.

Admission #1: Admit that Bobby G[] has never assumed parental responsibility for Marquette S[].

Admission #2: Admit that Bobby G[] has never established a substantial parental relationship with Marquette S[].

Admission #3: Admit that Bobby G[] has never exercised responsibility for the daily supervision of Marquette S[].

Admission #4: Admit that Bobby G[] has never exercised responsibility for the education of Marquette S[].

Admission #5: Admit that Bobby G[] went six months or longer without having face to face contact with Marquette S[].

Admission #6: Admit that Bobby G[] was unaware that he was the father of Marquette S[] until after June 16, 2004.

Admission #7: Admit that Bobby G[] was not involved in assisting in, or providing for, the pre-natal care of Marquette S[].

Admission #8: Admit that Bobby G[] went six months or longer without having any communication with Marquette S[].

Admission #9: Admit that Bobby G[] has never paid child support for Marquette S[].

Admission #10: Admit that Bobby G[] has never met Marquette S[].

Admission #11: Admit that Bobby G[] was unaware that he was the father of Marquette S[] until he was informed of DNA test results indicating his paternity.

¶ 15. The State also submitted 24 interrogatories along with the requests for admissions. The interrogatories probed the nature of Bobby G.'s relationship with

Marquette, including what efforts Bobby G. had made to provide for Marquette and for Denise W. The interrogatories requested information about Bobby G.'s conduct through April 20, 2005, that is, including a period of time after the petition for termination of parental rights had been filed.

¶ 16.  Many of Bobby G.'s responses to the interrogatories support the admissions that Bobby G. took no steps to assume parental responsibility before he learned of the existence of his son.[9] Several of the

[9] For instance, Bobby G. was asked the following questions and supplied the following answers:

> Interrogatory #1: If your answer to any of petitioner's First Set of Requests for Admissions was anything other than an unqualified admission, please set forth in detail, for each and every admission, the factual basis for your response and identify all documents and witnesses that support or in any way relate to your answer.
>
> Response 1:
>
> No answer.
>
> Interrogatory #3: Please list the date, location, duration and nature of each and every contact Bobby G[] has had with any foster parent of Marquette S[] between August 31, 2003, and April 20, 2005.
>
> Response 3:
>
> None
>
> Interrogatory #20: Please list all steps Bobby G[] has taken to establish a substantial parental relationship with Marquette S[].
>
> Response 20:
>
> None.
>
> Interrogatory #24: Please list all steps Bobby G[] has taken to exercise significant responsibility for the care of Marquette S[].
>
> Response 24:
>
> None.

responses to the interrogatories demonstrated, however, that after he learned of his son's existence Bobby G. made repeated efforts to communicate with his son and was interested in developing a parental relationship.[10] According to the interrogatories, after he learned that he was Marquette's father, Bobby G. communicated with the caseworkers assigned to

<hr>

[10] Of note, Bobby G. was asked the following questions and supplied the following answers:

Interrogatory #4: Please list the date, location, duration and nature of each and every contact Bobby G[] has had with any BMCW [Bureau of Milwaukee Child Welfare] social worker since August 31, 2003.

Response 4:

Month of February, 2 letters to BMCW caseworker.

Month of March, 1 letter to BMCW Caseworker, several calls to BMCW Caseworker from Caseworker at Fox Lake.

Specific dates unknown.

Interrogatory #5: Please list each and every date on which Bobby G[] attempted to visit or communicate with Marquette S[] between August 31, 2003, and April 20, 2005.

Response 5:

Month of February, 2 letters to BMCW Caseworker

Month of March, 1 letter to BMCW Caseworker, several calls to BMCW Caseworker from Caseworker at Fox Lake.

Specific dates unknown.

All contacts attempted were in an effort to inquire about Marquette S[], his welfare and attempts to contact him.

Interrogatory #6: For each and every date listed in response to Interrogatory #5, please list every reason why no visit or communication occurred.

Response 6:

BMCW worker did not return contact to Bobby G[] on any occasion.

Marquette's case, inquiring how he could establish communication with his son. Thus the circuit court was aware at the grounds phase of the termination proceedings that Bobby G. was attempting to reach out to his son.

¶ 17.   On June 27, 2005, the State filed a notice of motion and motion for partial summary judgment. Bobby G. argued that summary judgment was inappropriate because there were material facts in dispute and he wanted a jury to decide them.[11]

¶ 18.   On September 16, 2005, more than a year after the petition for termination was filed, the circuit court heard argument on the State's motion for partial summary judgment. The State argued that given Bobby G.'s admissions that he did not know about Marquette prior to the filing of the petition for termination of parental rights and had not developed a substantial relationship with Marquette prior to the filing of the petition for termination of parental rights, the State was entitled to summary judgment on the issue of whether grounds existed under Wis. Stat. § 48.415(6) to

[11] In his response brief in opposition to partial summary judgment, Bobby G. contended:

Section 48.415(6) Wis. Stats. states that a jury must consider whether the respondent has accepted and exercised significant responsibility for the daily supervision, education, protection and care of the child. The jury must further consider whether the respondent has ever expressed concern for or interest in the support, care and well being of the child or has neglected or refused to provide care or support for the child. Finally, the jury must examine whether respondent expressed any concern or support for the mother during her pregnancy. Respondent argues that his actions prior to the birth of the child as whether he has refused to provide care and support have not been addressed in the admissions or interrogatories and therefore are an issue for the jury.

terminate Bobby G.'s parental rights. Bobby G. opposed summary judgment, but he did not file a supporting affidavit.[12] Bobby G. argued that it was a "factual case" for a jury.

¶ 19.   At the end of the hearing on the motion for summary judgment, the circuit court granted the State's motion, declaring that the ground for termination was proved and that Bobby G. was unfit. The circuit court's sole basis for its ruling was that Bobby G. had failed to assume his parental responsibilities before he even knew of the existence of his biological child. The circuit court stated:

> And, quite frankly, there are no factual issues as it relates to a failure to assume. He didn't know he was the father; didn't take part. There is [sic] no other facts. There are no facts in dispute for the jury to consider and I am going to grant the State's motion for summary judgment on failure to assume as it relates to the father for Marquette.

¶ 20.   The circuit court expressed uneasiness with terminating Bobby G.'s parental rights on a failure to assume parental responsibility during the time when he did not know of the existence of his son, describing the unfairness of the situation as follows:

> I'd be less than honest if I didn't say that these kinds of fact situations described here as it relates to your client [Bobby G.] leaves a very bad taste in my mouth. That is a euphemism. But what it is is, there is a kind of an unfairness; there is something wrong about somebody

---

[12] Although Bobby G. did not submit an affidavit, Bobby G.'s sworn admissions and interrogatories were in the record before the circuit court. Bobby G. had signed his responses to the State's request for admissions and the State's interrogatories under oath in open court on June 21, 2005.

who didn't know he was the father, finds out he is the father, wants to do the right thing by his biological child and is prohibited from doing so. That is the unfairness kind of, and that is the thing that leaves the bad taste.

¶ 21. The circuit court also expressed concerns, however, about the best interests of the child, stating as follows:

[The] [f]lip side is maybe this child is just the bi-product [sic] of an act of sexual intercourse and that is all that his involvement was. And then we have to deal with the best interests of the child. What is best for this little child, because that is really what the best interest phase is about. It's about the child is on equal footing with the parent as to what is best for that little child. And maybe I think the caselaw even says it is probably in a stronger position than the parent.

My concerns in terms of the fairness can be taken care of in this second phase, and that is why I asked the district attorney for their position on that. I believe the concerns your client [Bobby G.] mentions can be properly addressed.

¶ 22. On October 25, 2006, the circuit court held a dispositional hearing to determine whether termination of Bobby G.'s parental rights would be in Marquette's best interests.

¶ 23. The State presented one witness, Dr. Jeffrey, Marquette's foster father. Dr. Jeffrey testified about how he and his wife managed Marquette's special medical and developmental needs, how Marquette had bonded with and had become attached to the foster family, and how the foster family was committed to adopting Marquette. Dr. Jeffrey also testified that Denise W. had dwindling contact with Marquette, that Marquette had little contact with his biological siblings, and that Bobby G. had never met or spoken with Marquette.

¶ 24. Bobby G. also testified. He explained his relationship with Denise W. and described his attempts to remain in communication with her. According to Bobby G.'s testimony, Bobby G. and Denise W. met during the summer of 2002 when they were inmates in the Milwaukee County Jail. They exchanged letters for about four months while incarcerated. Approximately four weeks after they were released from jail in December 2002, Bobby G. and Denise W. met and had sexual intercourse. Bobby G. stated he made several attempts afterward to see Denise W., but his repeated visits to her residence proved unfruitful. A neighbor informed him that Denise W. had moved. Bobby G. admitted that he did not try to communicate with Denise W. thereafter.

¶ 25. Bobby G. testified that he had not known that Denise W. was pregnant and that he was unaware of Marquette's existence until he was served with the summons for the termination of parental rights proceedings.[13]

¶ 26. Bobby G. also explained in detail his efforts to begin a father-son relationship with Marquette upon learning of Marquette's existence after the petition to terminate his parental rights to Marquette was filed.[14]

[13] The State's brief points out that Bobby G. could have learned whether a child came of his sexual encounter with Denise W. by filing with the registry of paternal interest maintained by the Department of Health and Social Services. *See* Wis. Stat. § 48.025. The State asserts that had Bobby G. taken this step he would have known about Marquette's existence when Marquette was 20 days old, that is, when the CHIPS proceedings began. Wis. Stat. § 48.27(3)(b)1.a. (a man with a registered paternal interest shall receive notice of CHIPS proceedings).

[14] According to the record, Bobby G. sent three letters to case manager Rachel Dreibelbis and tried to reach her by telephone, all without receiving a response. Bobby G.'s girl-

¶ 27. In addition to testifying about his communications with the Bureau of Milwaukee Child Welfare, Bobby G. testified that he had enrolled in several personal development programs at the prison where he was incarcerated, including drug and alcohol programs, domestic violence programs, and a class on parenting skills.[15]

¶ 28. After hearing the testimony and evidence presented at the dispositional phase, the circuit court concluded that terminating Bobby G.'s parental rights to Marquette was in Marquette's best interests. Acknowledging that Bobby G. was trying to do "the right thing" for his biological child, the circuit court concluded that those efforts came too late.

> And the law says if you have sexual intercourse with a woman, it is logical to presume that that woman would become pregnant.

---

friend also called the caseworker asking for photographs of Marquette. Bobby G. telephoned case manager Jenny Kuehn and also sent her letters, inquiring how to communicate with his son. Bobby G. also contacted a third case manager, Ellettra Webster, sending her letters and placing three phone calls to her office. He was able to speak to her once on the phone about Marquette. Bobby G. also sent the case manager a pair of children's shoes (too small) for Marquette and a $25 money order, which were not given to the foster father, Dr. Jeffrey, until the dispositional hearing.

[15] During the termination of parental rights proceedings, Bobby G. was involved in criminal court proceedings as a result of selling cocaine to an undercover officer in April 2004. He awaited trial in the Milwaukee County Jail and on October 1, 2004, was sentenced to seven years, six months in the Wisconsin State Prison system, to be served as two years and six months of initial confinement, followed by five years of extended supervision.

Now, as a practical matter you didn't know [that Marquette existed] and all of those things, but the Supreme Court has stated a law that your obligation towards the child started at that point, and the fact that you didn't know and all those things as a practical matter is true but in a legal sense it is not a defense.

So your rights were terminated for failure to assume, and that's because you had sex with this lady and she became pregnant and she didn't know you were the father. She named other people ahead of time, but you had a legal obligation from that point in time.

¶ 29. The circuit court did not consider relevant the evidence adduced concerning Bobby G.'s efforts to establish a substantial parental relationship with Marquette. The circuit court announced:

So a great deal of the testimony that we took as it's [sic] relates to you today really isn't particularly relevant.

¶ 30. The circuit court ordered termination of Bobby G.'s parental rights to Marquette on November 4, 2005.

¶ 31. Bobby G. filed a notice of appeal, and on March 9, 2006, his attorney submitted a no-merit report to the court of appeals. Appellate counsel identified two possible challenges for an appeal in the no-merit report and explained why neither had arguable merit.

¶ 32. First, appellate counsel examined whether the circuit court had erred in granting the State's motion for partial summary judgment. Because Bobby G. admitted he had no substantial relationship with Marquette and had taken no efforts to care for Marquette before the termination proceedings began, and because Bobby G. did not file any affidavits in opposition to the State's motion for summary judgment attesting

549

that he did express concern for the child either before or after birth, appellate counsel concluded that summary judgment was proper.[16]

¶ 33. Second, appellate counsel examined whether the circuit court had erred in exercising its discretion at the dispositional stage by terminating Bobby G.'s parental rights. Because the circuit court applied the proper standard of law, considered the relevant facts, and used a rational process, appellate counsel concluded that the circuit court properly exercised its discretion.

¶ 34. The court of appeals accepted the no-merit report by order dated April 25, 2006. The court of appeals explained its decision as follows:

> The no-merit report thoughtfully and expertly analyze [sic] these issues. Accordingly, this court adopts the no-merit brief as our own statement of the case, and independently conclude [sic] that the two issues identified in the no-merit report lack all arguable merit. Upon our review of the record, we further conclude that it presents no additional issues of arguable merit. Accordingly, we affirm the circuit court's dispositional order . . . (internal citations omitted).

¶ 35. Bobby G. filed a letter to this court on May 23, 2006, which this court, the State, and the guardian ad litem treated as a petition for review.

II

¶ 36. This court reviews a circuit court's grant of summary judgment independently, applying the same

---

[16] Bobby G. asserts in this court that to the extent that evidence of his attempts to form a relationship with Marquette was not before the circuit court when it considered the State's motion for summary judgment, Bobby G.'s counsel was ineffective.

methodology as the circuit court but benefiting from the circuit court's analysis. Summary judgment is appropriate when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Wis. Stat. § 802.08(2).

¶ 37. Although relying primarily on a constitutional rather than a statutory analysis, Bobby G. asserts that summary judgment was improper in the instant case because the circuit court failed to consider the evidence that Bobby G. made attempts to establish a relationship after the filing of the termination petition and after he learned of Marquette's existence.

¶ 38. In contrast, the State contends that under Wis. Stat. § 48.415(6), Bobby G.'s conduct after the petition for termination was filed is irrelevant and that the statute so interpreted is constitutional. The State claims it has established under Wis. Stat. § 48.415(6) Bobby G.'s "failure to assume parental responsibility" by the uncontested, admitted facts in the admissions and interrogatories that Bobby G. had no involvement with Marquette from conception through the filing of the petition for termination of parental rights.

¶ 39. Partial summary judgment at the grounds phase of a termination of parental rights proceedings is permitted,[17] although the court has also acknowledged

---

[17] In *Steven V.*, 271 Wis. 2d 1, ¶ 5, the court held that partial summary judgment could be granted in certain termination of parental rights cases on the issue of grounds. The court stated:

[P]artial summary judgment in the unfitness phase of a TPR case is available where the requirements of the summary judgment statute and the applicable legal standards in Wis. Stat. §§ 48.415 and 48.31 have been met. An order granting partial summary judgment on the issue of parental unfitness where there are no facts in dispute and the applicable legal standards have been

that not all termination of parental rights cases are suited for partial summary judgment. The court has explained that "[t]he grounds for unfitness most likely to form the basis of a successful motion for partial summary judgment in a [termination of parental rights] case are those that are sustainable on proof of court order or judgment of conviction, the reliability of which is generally readily apparent and conceded."[18]

¶ 40. The court has cautioned that "[i]n many [termination of parental rights] cases, the determination of parental unfitness will require the resolution of factual disputes by a court or jury at the fact-finding hearing, because the alleged grounds for unfitness involve the adjudication of parental conduct vis-à-vis the child."[19] The court has further explained that "summary judgment will ordinarily be inappropriate in [termination of parental rights] cases premised on these fact-intensive grounds for parental unfitness."[20] The court has identified Wis. Stat. § 48.415(6) as a fact-intensive ground probably not suited for partial sum-

satisfied does not violate the parent's statutory right to a jury trial under Wis. Stat. §§ 48.422(4) and 48.31(2), or the parent's constitutional right to procedural due process.

In *Steven V.*, we allowed summary judgment to be granted under Wis. Stat. § 48.415(4), which establishes as a ground to terminate parental rights the denial of physical placement and visitation by court order for more than one year.

More recently, in *Oneida County v. Nicole W.*, 2007 WI 30, 299 Wis. 2d 637, 728 N.W.2d 652, we allowed summary judgment under Wis. Stat. § 48.415(10), which establishes as a ground to terminate parental rights the prior involuntary termination of parental rights to another child within the previous three years.

[18] *Steven V.*, 271 Wis. 2d 1, ¶ 42.

[19] *Id.*, ¶ 36.

[20] *Id.*

mary judgment, but the court has not held that this ground could never form the basis for partial summary judgment. The court has instead stressed that "[t]he propriety of summary judgment is determined case-by-case."[21]

¶ 41. The propriety of summary judgment in the present case depends on the proper interpretation of Wis. Stat. § 48.415(6) and whether any facts or inferences therefrom are in dispute. If § 48.415(6) is interpreted to mean, as the circuit court declared, that the State need prove only Bobby G.'s failure to assume parental responsibility between the time of conception and the filing of the petition for termination of parental rights, regardless of whether Bobby G. knew or had reason to believe that his child existed, then the facts may be viewed as undisputed and summary judgment lies. If, however, under § 48.415(6) a circuit court must weigh a father's efforts to establish a parental relationship with a child after he learns of his paternity but before the grounds for termination are adjudicated, then the circuit court erred as a matter of law in its interpretation of the statute, in refusing to consider evidence of Bobby G.'s efforts, in granting summary judgment, and in failing to accord Bobby G. the jury trial he requested.

■

¶ 42. We must therefore decide the proper interpretation of Wis. Stat. § 48.415(6). Statutory interpretation ordinarily is a question of law that this court decides independently of the circuit court and court of appeals but benefiting from the analyses of these courts.

---

[21] *Id.*, ¶ 37 n.4.

### III

¶ 43. We begin our statutory interpretation with the text of Wis. Stat. § 48.415(6).

¶ 44. Wisconsin Stat. § 48.415(6) provides as follows:

> (6) **Failure to assume parental responsibility.** (a) Failure to assume parental responsibility, which shall be established by proving that the parent or the person or persons who may be the parent of the child have <u>never had a substantial parental relationship with the child.</u>
>
> (b) In this subsection, "substantial parental relationship" means the acceptance and exercise of significant responsibility for the daily supervision, education, protection and care of the child. In evaluating whether the person has had a substantial parental relationship with the child, the court may consider such factors, including, but not limited to, whether the person has <u>ever</u> expressed concern for or interest in the support, care or well-being of the child, whether the person has <u>neglected or refused</u> to provide care or support for the child and whether, with respect to a person who is or may be the father of the child, the person has <u>ever</u> expressed concern for or interest in the support, care or well-being of the mother during her pregnancy (emphasis added).

■

¶ 45. Wisconsin Stat. § 48.415(6)(a) provides that failure to assume parental responsibility is a ground for termination of parental rights. Failure to assume parental responsibility is established by proof that the parent has never had a substantial parental relationship with the child. The statute defines "substantial parental relationship" as the "acceptance and exercise of significant responsibility for the daily supervision, education, protection and care of the child."

¶ 46.   Section 48.415(6)(b) gives the following non-exclusive examples of what a court may consider in evaluating whether the person has had a substantial parental relationship with the child: whether the person has ever expressed concern for or interest in the support, care, or well-being of the child, whether the person has neglected or refused to provide care or support for the child, and whether, with respect to a person who is or may be the father of the child, the person has ever expressed concern for or interest in the support, care, or well-being of the mother during her pregnancy.

¶ 47.   Section 48.415(6) contains no express directive regarding whether a circuit court must consider that the father did not know of or have reason to believe of the existence of the child before the petition for termination was filed when deciding whether the father never had a substantial parental relationship with the child.

¶ 48.   The State argues that Bobby G.'s efforts to assume parental responsibility after the petition to terminate was filed and after he learned of his paternity but before grounds for termination were adjudicated are irrelevant. We are not persuaded by this argument for several reasons.

¶ 49.   First, Wis. Stat. § 48.415(6)(b) explicitly uses language that evidences the relevancy of whether a father knew or had reason to believe he was the father before the petition for termination of parental rights was filed. Section 48.415(6)(b) requires that "[i]n evaluating whether the person has had a substantial parental relationship with the child," the circuit court may consider "whether the person [father here] has ne-glected or refused to provide care or support for the

555

child (emphasis added)." The words "neglected" and "refused" convey a willful or deliberate omission. The word "neglected" is not synonymous with negligence here. Rather, in the context of child support, "neglect" is commonly understood to mean a willful failure to provide support; a breach of the duty to support.[22] Likewise, the word "refuse," as commonly understood, involves a decision to reject a certain choice or course of action.[23] Accordingly, the words "neglected" and "refused" in § 48.415(6)(b) carry with them the sense that the father knew or had reason to believe he was the father but nevertheless did not provide care or support. In deciding whether a father neglects or refuses to provide care or support for the child, a circuit court

[22] *State v. Cissell,* 127 Wis. 2d 205, 225, 378 N.W.2d 691 (1985). In *Cissell,* the court interpreted a child support statute that used the term "willfully neglects." The defendant contended that the statute was vague and thus violated his due process rights. Specifically, the defendant argued that the phrase "willfully neglects" was internally inconsistent because "willful" denoted intent and "neglect" denoted negligence.

The *Cissell* court disagreed with the defendant, holding that the statute was not void for vagueness. In reaching this conclusion, the court examined the relevant definitions of "willful" and "neglect." 127 Wis. 2d at 225. The *Cissell* court explained the meaning of the word "neglect" as follows:

> Black's [Law Dictionary] also defines neglect as the designed refusal or unwillingness to perform a duty. We conclude, therefore, that neglect does not mean negligence in the support context. Neglect means breach of the duty of support.

127 Wis. 2d at 225. *Cissell's* interpretation of "neglect" in the child support context is relevant in understanding Wis. Stat. § 48.415(6), which examines whether a parent has neglected or refused to provide child support.

[23] *State ex rel. Kalal v. Circuit Court for Dane County,* 2004 WI 58, ¶¶ 7, 54, 271 Wis. 2d 633, 681 N.W.2d 110.

should consider whether these failures were willful or deliberate. A circuit court therefore would have to take into account whether the father knew or had reason to believe he was the father when considering whether the father "neglected" or "refused" to care for the child.[24]

¶ 50. Second, Wis. Stat. § 48.415(6) contains no express directive regarding whether the circuit court can consider only parental efforts undertaken prior to the filing of the petition for termination of parental rights. The text seems to say the circuit court is not so limited. Wisconsin Stat. § 48.415(6)(a) requires that the party seeking termination must prove a parent's failure to assume parental responsibility by demonstrating that the parent has "*never* had a substantial parental relationship with the child" (emphasis added). "Never" means never.

¶ 51. Likewise, a circuit court may consider under § 48.415(6)(b) whether a parent has "*ever*" expressed concern for or interest in the well-being of the child or whether the father has "*ever*" expressed concern for or interest in the well-being of the mother during her pregnancy. "Ever" means ever.

¶ 52. The words "never" and "ever" in Wis. Stat. § 48.415(6) certainly do not suggest that the relevant period for consideration in termination of parental rights cases ends at the filing of the petition. The words "never" and "ever" signal that the circuit court must consider all facts available, including a parent's conduct

---

[24] Wisconsin Stat. § 48.415(6) provides a non-exclusive list of factors that the circuit court may consider as relevant to its determination of whether the parent failed to assume parental responsibility. Our analysis does not make this factor mandatory in the circuit court's determination; rather, the point is that when applying this factor, a circuit court *must* consider whether the father knew or had reason to believe the child existed.

after the petition for termination was filed, when deciding whether a substantial parental relationship exists.[25]

¶ 53.  Third, the introductory language in Wis. Stat. § 48.415 provides that a circuit court's finding that a ground exists for the termination of parental rights is made "at the fact-finding hearing."[26] This language does not require that the evidence regarding the grounds be limited to what has transpired as of the date of filing of the petition. All the statute requires is that at the time of the fact-finding hearing the State prove the statutory grounds for termination by clear and convincing evidence.

---

[25] For an example of an interpretation of "never," see *State v. Quinsanna D.*, 2002 WI App 318, 259 Wis. 2d 429, 655 N.W.2d 752, in which the mother argued that because she had taken care of the children for two years before they were removed from her home, the jury verdict could not find that she never had a substantial relationship with them under Wis. Stat. § 48.415(6). The court declared that "never" does not mean that any indication of an assumption of parental responsibility satisfies the statute, but rather requires the court to consider the parental conduct at the hearing on grounds. The court of appeals upheld the jury verdict, explaining that

> Wis. Stat. § 48.415(6)(b) provides that a "substantial parental relationship" consists of . . . "the acceptance and exercise of significant responsibility" for, among other things, the "protection and care of the child." Here, the jury reasonably could have inferred that, because Quinsanna's "daily supervision" of [her twin sons] included her daily exposure of them to her own drug use and drug house, she had not exercised "significant responsibility" for their "protection and care."

*Id.*, ¶ 32 (citations omitted).

[26] The introductory language to Wis. Stat. § 48.415 preceding the enumerated grounds for termination provides as follows:  "At the fact-finding hearing the court or jury may make a finding that grounds exist for the termination of parental rights. Grounds for termination of parental rights shall be one of the following: . . . ."

¶ 54.  Fourth, Wis. Stat. § 48.31(1), although relied upon by the State, does not support the State's position that the relevant cut-off date for evidence relating to the assumption of parental responsibility is the date the petition for termination is filed. Wisconsin Stat. § 48.31(1) provides that a " 'fact-finding' hearing means a hearing to determine if the allegations in a petition . . . to terminate parental rights are proved by clear and convincing evidence." The State claims that the "allegations in the petition" necessarily include only those facts that precede its filing. The State urges that a father's post-termination petition conduct is admissible only for grounds for termination that contain a predictive element and that § 48.415(6) does not include a predictive element. The State cites no support except a comment to the jury instruction Wis JI—Children 180. The comment, however, acknowledges that the issue of the time period arises in several grounds and concludes that "the question of timing the jury's consideration of prepetition and postpetition evidence must be resolved by the trial judge in the context of the jurisdictional ground at issue."

¶ 55.  Likewise, Wis. Stat. § 48.424, which describes the fact-finding hearing at the grounds phase that must occur as part of a termination of parental rights proceeding, also does not command the conclusion that evidence must be limited to a parent's conduct that occurred before the petition for termination of parental rights was filed. Sub-section 48.424(1) states in relevant part: "[t]he purpose of the fact-finding hearing is to determine whether grounds exist for the termination of parental rights . . . ." Nothing about this provision limits the evidence to pre-petition conduct. Sub-section 48.424(2) provides in relevant part that a "fact-finding hearing shall be conducted according to

559

the procedure specified in s. 48.31 . . . ." This provision directs our attention only to § 48.31, which we already concluded does not limit the scope of the fact-finding hearing to the facts alleged in the petition to terminate parental rights.[27]

¶ 56. Fifth, the State's position on Wis. Stat. § 48.415(6) is not in accord with the express purposes of the Children's Code, which codifies the statutory provisions on termination of parental rights. Our interpretation of § 48.415(6) comports with the purposes of the Code.

¶ 57. The legislature expressly intended to protect, whenever appropriate, the biological family unit. As one of the express goals of the Children's Code, the legislature declared as follows:

> While recognizing that the paramount goal of this chapter is to protect children and unborn children, to preserve the unity of the family, whenever appropriate, by strengthening family life through assisting parents and the expectant mothers of unborn children, whenever appropriate, in fulfilling their responsibilities as parents or expectant mothers. The courts and agencies responsible for child welfare, while assuring that a child's health and safety are the paramount concerns, should assist parents and the expectant mothers of unborn children in changing any circumstances in the home which might harm the child or unborn child.

Wis. Stat. § 48.01(a).

---

[27] Our holding does not mean that the State can terminate parental rights on allegations not included in the petition. The State must adhere to the notice provisions. Our holding is directed towards the evidence that can be presented at the fact-finding hearing to support or refute the allegations in the petition.

¶ 58. With regard to the termination of parental rights, the legislature has expressly announced that efforts must be made to reunite biological families whenever appropriate. The termination of parental rights is not supposed to occur until efforts at reunification have failed. The goal is therefore:

> To allow for the termination of parental rights at the earliest possible time after rehabilitation and reunification efforts are discontinued in accordance with this chapter and termination of parental rights is in the best interest of the child.

Wis. Stat. § 48.01(gr).

¶ 59. Because biological parents' rights are deserving of protection, the legislature expressly mandated fair procedures to safeguard parental rights in their biological children. As such, the legislature intended:

> To provide judicial and other procedures through which children and all other interested parties are assured fair hearings and their constitutional and other legal rights are recognized and enforced, while protecting the public safety.

Wis. Stat. § 48.01(ad).

¶ 60. A biological parent's rights, of course, are not the only interests at stake. The Children's Code attempts to strike the appropriate balance between competing interests, including those of the biological parent in his or her relationship with the child, those of the child in permanence and stability in familial relationships, and those of the State in securing efficient and speedy resolution of termination of parental rights proceedings. Thus, the legislature announced that the courts need not reunite families in all instances:

> The courts should recognize that they have the author-ity, in appropriate cases, not to reunite a child with his or her family. The courts and agencies responsible for child welfare should also recognize that instability and impermanence in family relationships are contrary to the welfare of children and should therefore recognize the importance of eliminating the need for children to wait unreasonable periods of time for their parents to correct the conditions that prevent their safe return to the family.

Wis. Stat. § 48.01(a).

¶ 61. The legislature explicitly requires that the Children's Code "shall be liberally construed to effectu-ate" the stated legislative purposes. Wis. Stat. § 48.01.

■

¶ 62. To effectuate the stated legislative purposes requires a circuit court, in determining whether grounds exist under § 48.415(6), to consider the efforts of a biological parent to assume parental responsibility after the filing of the termination of parental rights petition but before adjudication of the grounds for termination. Furthermore, as a matter of sound judicial administration, a circuit court should make determina-tions on parental rights with access to the fullest information concerning the biological parents and chil-dren, including information on whether the parent has assumed parental responsibility up to the hearing on the grounds for termination.

¶ 63. Sixth, the State's position on Wis. Stat. § 48.415(6) is also inconsistent with the specific statu-tory provisions the legislature enacted to protect a putative father's rights in a termination of parental rights proceeding. "Terminations of parental rights affect some of parents' most fundamental human

rights."[28] Termination proceedings require heightened legal safeguards against erroneous decisions.[29] For instance, Wis. Stat. § 48.42(2)(b)2. protects a nonmarital father's right to notice of a termination proceeding. Likewise, § 48.422(6)(a) and (6)(b) protect a putative father's right to participate at the termination of parental rights proceeding.

¶ 64.   If we were to accept the State's interpretation of Wis. Stat. § 48.415(6) as allowing evidence of a father's conduct only up to the date of the filing of the petition to terminate parental rights, the statute would in many instances create an irrebutable presumption that a man who does not know he is the father of a child before the filing of the petition for termination cannot assume parental responsibility for the child.[30] The creation of this irrebutable presumption is not in accord with the various statutory provisions protecting the rights of a putative father and guaranteeing a father's participation in the termination proceedings. We must interpret the statutory scheme holistically to avoid absurd results.

¶ 65.   Seventh, the State's position on Wis. Stat. § 48.415(6) contravenes the statutory history of Wis. Stat. § 48.415(6), that is, the previously enacted and repealed statutory provisions, from the adoption of § 48.415(6) in 1979 until the 2003–04 version governing the present case.

---

[28] *Evelyn C.R.*, 246 Wis. 2d 1, ¶ 20.

[29] *Id.*, ¶ 21.

[30] Section 48.415(6) takes into account the conduct of a putative father toward the mother during her pregnancy. There might be situations in which a man who does not know he is the father-to-be takes sufficient steps to establish a substantial parental relationship by expressing care and concern for the mother.

563

¶ 66.  Section 48.415(6) was originally enacted in 1979 and establishes "failure to assume parental responsibility" as a ground for the termination of parental rights.[31] In the 1979 statute, the failure to assume parental responsibility may be established by demonstrating that the father did not establish a substantial parental relationship "prior to the adjudication of paternity although the father had reason to believe he was the father and had an opportunity to establish a substantial relationship (emphasis added)." Section 48.415(6)(a)2. stated in relevant part as follows:

> (a) Failure to assume parental responsibility may be established by a showing that a child has been born out of wedlock, not subsequently legitimated or adopted, that paternity was not adjudicated prior to the filing of the petition for termination of parental rights and:
>
>     . . . .
>
> 2. That although paternity to the child has been adjudicated under s. 48.423, the father did not establish a substantial parental relationship with the child prior to the adjudication of paternity although the father had reason to believe that he was the father of the child and had an opportunity to establish a substantial parental relationship with the child (emphasis added).

¶ 67.  Subsection (b) of Wis. Stat. § 48.415(6) enumerated non-exclusive factors a circuit court could consider in evaluating whether a person has had a substantial parental relationship with the child. One of these factors was whether the parent "has neglected or refused to provide care or support even though the person has had the opportunity and ability to do so" (emphasis added). Section 48.415(6)(b) read as follows in 1979:

---

[31] Chapter 330, Laws of 1979; 1979 A.B. 656.

(b) In this subsection, "substantial parental relationship" means the acceptance and exercise of significant responsibility for the daily supervision, education, protection and care of the child. In evaluating whether the person has had a substantial parental relationship with the child, the court may consider such factors, including, but not limited to, whether the person has ever expressed concern for or interest in the support, care or well-being of the child or the mother during her pregnancy and whether the person has neglected or refused to provide care or support even though the person had the opportunity and ability to do so (emphasis added).

¶ 68. In 1987, the legislature amended Wis. Stat. § 48.415(6)(a)2.[32] The amended statute still provided that the party seeking termination could prove failure to assume parental responsibility by demonstrating that the father did not establish a substantial parental relationship with the child prior to the adjudication of paternity although the person had reason to believe he was the father of the child. The 1987 amendment deleted, however, the statutory language in § 48.415(6)(a)2. that expressly addressed whether a father had an opportunity to develop a substantial relationship with his biological child.

---

[32] 1987 Wisconsin Act 383, § 15; 1987 A.B. 978.

In 1983, 1983 Laws of Wisconsin ch. 446, § 8, the Wisconsin legislature amended Wis. Stat. § 48.415(6)(a) (intro.) to read as follows:

(a) (intro) Failure to assume parental responsibility may be established by a showing that a child has been born out of wedlock, not subsequently legitimated or is a nonmarital child who has not been adopted or whose parents have not subsequently intermarried under s. 767.60, that paternity was not adjudicated prior to the filing of the petition for termination of parental rights and:

The stricken-through language was omitted. The underlined language was added. We need not discuss this change further because it does not affect the instant case.

¶ 69. Subsection 48.415(6)(a)2. was amended in 1987 to read as follows:

> 2. That although paternity to the child has been adjudicated under s. 48.423, the father did not establish a substantial parental relationship with the child prior to the adjudication of paternity although the father had reason to believe that he was the father of the child and ~~had an opportunity to establish a substantial parental relationship with~~ has never assumed parental responsibility for the child.

The insertions are shown by underlining and the deletions are shown as stricken.

¶ 70. Subsection (b) of Wis. Stat. § 48.415(6) was also revised in 1987 as part of the same bill to eliminate the final phrase of subsection (6)(b) stating "even though the person had the opportunity [to provide care and support] and ability to do so." Subsection (b) as amended in 1987 (with tracked changes) reads as follows:

> (b) In this subsection, "substantial parental relationship" means the acceptance and exercise of significant responsibility for the daily supervision, education, protection and care of the child. In evaluating whether the person has had a substantial parental relationship with the child, the court may consider such factors, including, but not limited to, whether the person has ever expressed concern for or interest in the support, care or well-being of the child or the mother during her pregnancy and whether the person has neglected or refused to provide care or support ~~even though the person had the opportunity and ability to do so~~.

¶ 71. According to the Legislative Research Bureau's analysis: "This bill modifies the current grounds for an involuntary [termination of parental rights] based on the failure of a parent to assume parental responsibility for a nonmarital child by elimi-

nating the provision in which it must be shown that a father had an opportunity to establish a substantial parental relationship with the child prior to a paternity adjudication but failed to do so. This bill provides that it must be shown that a father never assumed parental responsibility for the child prior to the adjudication of his paternity."[33]

¶ 72. As a result of this 1987 amendment, the party seeking termination did not have to prove that the father had an opportunity to establish a substantial relationship with his biological child, although the party seeking termination still had to prove that prior to the adjudication of paternity the father had reason to believe that he was the father of the child and had never assumed parental responsibility for the child.

¶ 73. In 1989, the legislature once again amended Wis. Stat. § 48.415(6)(a)2.[34] The 1989 amendment sub-

---

[33] *See* Analysis by the Legislative Reference Bureau, 1987 AB 978, LRB-5180/1, in Bill Drafting File on 1987 AB 978, available at Wis. Legislative Reference Bureau, 1 East Main St., Madison, Wis.

An accompanying fiscal estimate by John Manske of the Department of Health and Social Services, Division of Community Services, in the same file states that "[t]his bill eliminates the requirement that it must be shown that a father had an opportunity to establish a substantial parental relationship with a non-marital child. Where adoptive placements are available this will speed up the adoption process, and will shorten a child's stay in foster care, resulting in a cost savings to counties."

*See also Ann M.M. v. Rob S.*, 176 Wis. 2d 673, 683–84, 500 N.W.2d 649 (1993) (concluding that Wis. Stat. § 48.415(6)(a)2. and (b) as amended in 1987 "no longer require a showing that the father had the opportunity and the ability to assume parental responsibility for the child").

[34] 1989 Wisconsin Act 86; 1989 A.B. 272.

stituted the language "filing of a petition for termination of parental rights" for the previous language "adjudication of paternity." Thus, as of 1989 the party seeking termination could prove failure to assume parental responsibility by demonstrating that the father did not establish a substantial parental relationship prior to the filing of a petition for termination of parental rights rather than prior to the adjudication of paternity.

¶ 74. After the 1989 amendment, Wis. Stat. § 48.415(6)(a)2. read as follows with tracked changes:

(a) Failure to assume parental responsibility may be established by a showing that a child is a nonmarital child who has not been adopted or whose parents have not subsequently intermarried under s. 767.60, that paternity was not adjudicated prior to the filing of the petition for termination of parental rights and:

. . . .

2. That although paternity to the child has been adjudicated under s.48.423, the father did not establish a substantial parental relationship with the child prior to the ~~adjudication of paternity~~ filing of a petition for termination of parental rights although the father had reason to believe he was the father of the child and has ~~never~~ not assumed parental responsibility for the child.

¶ 75. A Drafter's Note included in the Wisconsin Legislative Reference Bureau drafting file on 1989 AB 272 describes the reason for this 1989 change as follows: "The amendment of s. 48.415(6)(a)2 was [assistant district attorney] Meryl Manhardt's idea. She said that sometimes it takes 6 months or more to have a paternity hearing and during this time the father

starts spending just enough time with the child so that it can't be proven that he never assumed parental responsibility."[35]

¶ 76. The 1989 legislature expressly and unequivocally changed the relevant time frame during which the party seeking termination had to show that the father failed to assume parental responsibility. The party seeking termination would need to submit evidence of the lack of a substantial relationship only for the period up to the time when the petition for termination of parental rights was filed. Nevertheless, the party seeking termination still had to prove that prior to the filing of the termination petition the father had reason to believe that he was the father of the child and had not assumed parental responsibility for the child.

¶ 77. In 1995, the legislature consolidated, renumbered, and amended Wis. Stat. § 48.415(6).[36] The 1995 version of § 48.415(6) remained unchanged through 2005 and is the version of § 48.415(6) governing the instant case. The 1995 amendment was part of a bill prepared by the Joint Legislative Council's Special Committee on Children in Need of Protection or Services.[37]

---

[35] Drafter's Note from Evelyn Mazack, Legislative Attorney, in Wis. Legislative Reference Bureau drafting file on 1989 A.B. 272, LRB-0243/1an.

The impact of the amendment was also clearly expressed in the Fiscal Estimate: "[T]he bill makes it easier to bring TPR petitions in the circuit court."

[36] 1995 Wisconsin Act 275, §§ 82m-84; 1995 S.B. 501.

[37] The Joint Legislative Council consists of legislators from both the Assembly and Senate and functions through study committees that include legislators and public members. *See State ex rel. Kalal v. Circuit Court for Dane County*, 2004 WI 58, ¶ 69, 271 Wis. 2d 633, 681 N.W.2d 110 (Abrahamson, C.J.,

¶ 78. The language and structure of Wis. Stat. § 48.415(6) were substantially changed in 1995. Section 48.415(6)(a) reads as follows with the 1995 amendments (with the insertions and deletions shown):

> § 48.415(6)(a) Failure to assume parental responsibility ~~may,~~ which shall be established by ~~a showing~~ proving that ~~a child is a nonmarital child who has not been adopted or whose parents have not subsequently intermarried under s. 767.60, that paternity was not adjudicated prior to the filing of the petition for termination of parental rights and: 1. The~~ the parent or the person or persons who may be the ~~father~~ parent of the child ~~have been given notice under s. 48.42 but have failed to appear or otherwise submit to the jurisdiction of the court and that such person or persons~~ have never had a substantial parental relationship with the child~~; or~~.

> (b) In this subsection, "substantial parental relationship" means the acceptance and exercise of significant responsibility for the daily supervision, education, protection and care of the child. In evaluating whether the person has had a substantial parental relationship with the child, the court may consider such factors, including, but not limited to, whether the person has ever expressed concern for or interest in the support, care or well-being of the child ~~or the mother during her pregnancy and,~~ whether the person has neglected or refused to provide care or support for the child and whether, with respect to a person who is or may be the father of the child, the person has ever expressed concern for or interest in the support, care or well-being of the mother during her pregnancy.

¶ 79. For ease of reading, here is the statute without tracked changes:

---

concurring). The Special Committee here submitted its recommendations in bill form to the Council, which then proposed the legislation to the legislature.

§ 48.415(6)(a) Failure to assume parental responsibility, which shall be established by proving that the parent or the person or persons who may be the parent of the child have <u>never</u> had a substantial parental relationship with the child.

(b) In this subsection, "substantial parental relationship" means the acceptance and exercise of significant responsibility for the daily supervision, education, protection and care of the child. In evaluating whether the person has had a substantial parental relationship with the child, the court may consider such factors, including, but not limited to, whether the person has <u>ever</u> expressed concern for or interest in the support, care or well-being of the child, <u>whether the person has neglected or refused to provide care or support for the child</u> and whether, with respect to a person who is or may be the father of the child, the person has <u>ever</u> expressed concern for or interest in the support, care or well-being of the mother during her pregnancy (emphasis added).

¶ 80.   The 1995 version omits the phrase "a father had reason to believe he was the father of the child," which had appeared in every version of Wis. Stat. § 48.415(6)(a)2. since 1979. Thus the 1995 text no longer explicitly provides that the party seeking termination must prove that the father had never assumed parental responsibility for the child even though the father had reason to believe he was the father of the child.

¶ 81.   Furthermore, the 1995 version of Wis. Stat. § 48.415(6)(a) eliminated the 1989 statutory language requiring the party seeking termination to show that the father failed to establish a substantial parental relationship <u>prior to the filing of the petition for termination</u>. The 1995 statute also eliminated the 1985 statutory language requiring the party seeking termi-

nation to show that the father failed to establish a substantial parental relationship prior to the adjudication of paternity. Thus, unlike prior versions of 48.415(6), the 1995 statute contains no express language about the timeframe in which the party seeking termination must prove that the father has never assumed parental responsibility.

¶ 82. Despite the significant changes in language in 1995, the Note of the Joint Legislative Council's Special Committee that drafted the amendments to Wis. Stat. § 48.415(6) (printed in 1995 Wis. Act 275) states that no change was made to the prior statute except to expand the ground to include mothers, marital children, and fathers for whom paternity was adjudicated prior to the filing of the termination petition. The Note to § 48.415(6)(a) printed with 1995 Wis. Act 275 states:

> Under current law, the parental rights of the father of a nonmarital child, that is, a child who is neither conceived nor born while his or her parents are intermarried, who has not been adopted or whose parents have not subsequently intermarried and for whom paternity has not been adjudicated prior to the filing of the TPR petition may be terminated if: (1) the person or persons who may be the father of the child have been given notice about the PR petition but have failed to appear or otherwise submit to the jurisdiction of the court and have never had a substantial parental relationship with the child; or (2) that although paternity has been adjudicated, the father did not establish a substantial parental relationship with the child prior to the filing of the TPR petition although the father had reason to believe he was the father of the child and has not assumed parental responsibility for the child.

> This bill expands this ground for involuntary TPR to include: (1) mothers as well as fathers; (2) marital children as well as nonmarital children; and (3) fathers

572

for whom paternity was adjudicated prior to the filing of the TPR petition (second emphasis added).

¶ 83. The Note might lead one to believe that the drafters did not view the 1995 omission of the concept included since 1979, that the circuit court should consider whether the father had reason to believe that he was the father of the child, as substantively changing the statute. We agree with this conclusion. As discussed previously, the words "refuse" and "neglect" incorporate the concept of willfulness and deliberateness, that is, that the father had reason to believe he was the father but nevertheless did not provide care or support for the child. The Note also might lead one to believe that the drafters intended to require the father to have established a substantial parental relationship with the child prior to the filing of the petition to terminate parental rights. This view is not supported by the drafting history. The legislative drafting file on 1995 S.B. 501 at the Wisconsin Legislative Reference Bureau contains a Memorandum from staff attorneys at the Legislative Council to Senator Joanne Huelsman, Representative Shirley Krug, Representative Bonnie Ladwig, and the Legislative Reference Bureau commenting on recommended amendments.

¶ 84. One recommended amendment was to "[s]pecify the pertinent time period during which the parent must have failed to assume parental responsibility, for example, in the year prior to the time the [termination of parental rights] petition was filed." A handwritten "No" appears next to this recommendation. This amendment was not adopted.

¶ 85. The reasonable inference from the 1995 text of § 48.415(6)(a) and this drafting memorandum is that the legislature's removal of references to both the date

573

of adjudication of paternity and the date of filing of the termination petition removed the limitation on the proof of failure to assume parental responsibility to any date preceding the hearing on the grounds for termination.

¶ 86. Furthermore, the use of the words "never" and "ever," as we explained previously, support a circuit court's considering all evidence as of the hearing on the grounds for termination.

¶ 87. Our interpretation of the word "never" in Wis. Stat. § 48.415(6)(a) is supported by the same Memorandum from staff attorneys at the Legislative Council. A recommended amendment was to "[s]pecify that the parent has 'not' had a substantial parental relationship rather than 'never' had a substantial parental relationship." The staff attorneys' comment to this recommendation was, "This does appear to be a substantive difference." A handwritten "No" appears next to this recommendation.[38]

---

[38] In 2005 the legislature amended Wis. Stat. 48.415(6) again, changing "never" to "not" and omitting the word "ever." 2005 Act 293, § 21. Wisconsin Stat. § 48.415(6) now provides:

48.415(6)(a) Failure to assume parental responsibility, which shall be established by proving that the parent or the person or persons who may be the parent of the child have ~~never~~ not had a substantial parental relationship with the child.

(b) In this subsection, "substantial parental relationship" means the acceptance and exercise of significant responsibility for the daily supervision, education, protection and care of the child. In evaluating whether the person has had a substantial parental relationship with the child, the court may consider such factors, including, but not limited to, whether the person has ~~ever~~ expressed concern for or interest in the support, care or well-being of the child, whether the person has neglected or refused to provide care or support for the child and whether, with respect to a person who is or may be the father of the child, the person has ~~ever~~ expressed concern for or interest in the support, care or well-being of the mother during her pregnancy.

574

¶ 88.    The Legislative Council Special Committee on Adoption and Termination of Parental Rights Law, which had proposed the 2005 amendment, explained the need for the change as follows: "According to testimony received by the Special Committee, requiring a showing that the person has *never* had a substantial relationship with the child can be difficult if the parent ever showed any interest or had any contact with the child" (Report at 11).

■

¶ 89.    For the reasons set forth, we are unpersuaded by the State's position on Wis. Stat. § 48.415(6).

The Wisconsin Legislative Council's Proposed Report to the Legislature of the Special Committee on Adoption and Termination of Parental Rights Law (Mar. 28, 2005) states:

*Background*

. . . .

According to testimony received by the Special Committee, requiring a showing that the person has *never* had a substantial relationship with the child can be difficult if the parent ever showed any interest or had any contact with the child.

*Description*

The bill draft modifies this ground providing that failure to assume parental responsibility is established by proving that the parent *has not had* a substantial parental relationship with the child (emphasis in original).

The Special Committee's meeting minutes (Sept. 15, 2004) state the following:

Regarding the involuntary [termination of parental rights] ground of failure to assume parental responsibility, Mr. Kenney [a member of the Joint Legislative Council] said that the ground is very confusing and that requiring the state to show that the parent *never* had a substantial parental relationship with the child is frequently the focus of the defense. He said that he does not believe the Legislature intended minimal contact with a child to constitute a substantial parental relationship.

On the basis of the text of Wis. Stat. § 48.415(6), the purposes of the Children's Code, and the statutory evolution of § 48.415(6), we hold, contrary to the State's proffered interpretation, that under § 48.415(6) a father's efforts to assume parental responsibility for a biological child undertaken after he learns of the existence of the child but before the adjudication of the ground must be considered by the circuit court in determining whether the ground of failing to assume a parental relationship under § 48.415(6) has been proven by clear and convincing evidence.

¶ 90. Bobby G.'s responses to the State's interrogatories should have alerted the circuit court that Bobby G. was trying to establish a parental relationship with Marquette after he had reason to believe that he was Marquette's father. Summary judgment was inappropriate because material facts were presented disputing the State's claim that Bobby G. never assumed parental responsibility for Marquette.

¶ 91. Although Bobby G. admitted that, among other things, he failed to assume parental responsibility for Marquette and had not developed a substantial relationship with Marquette, the circuit court should not have automatically concluded that Wis. Stat. § 48.415(6) was satisfied by clear and convincing evidence. "Failure to assume parental responsibility" and "substantial parental relationship" are legally defined terms, and the statutory definitions may not neatly align with the common sense understanding of these phrases. Accordingly, the circuit court should not have so readily accepted Bobby G.'s admissions as concessions that the State had proved the requirements under § 48.415(6).

¶ 92. In addition, Wis. Stat. § 48.422(7)(c) provides that before accepting an admission of the alleged

facts in a petition, the circuit court shall address the parties and determine that the admission is made voluntarily with understanding of the nature of the actions alleged in the petition and the potential dispositions, and shall "make such inquiries as satisfactorily establish that there is a factual basis for the admission." The circuit court did not live up to these statutory obligations in the present case.

¶ 93. In any event, Wis. Stat. § 48.415(6) provides a non-exclusive list of factors that the circuit court or the jury may consider in determining whether the biological parent failed to assume parental responsibility. The State's requests for admissions and interrogatories did not expressly address all of the factors listed. Even if the State had sought admissions on all of the enumerated factors, the list of factors is not exclusive. Such admissions may still not constitute "clear and convincing" evidence that the statutory ground for termination was actually satisfied by clear and convincing evidence. Section 48.415(6) is a fact-intensive ground.

¶ 94. The circuit court erred as a matter of law in its interpretation of Wis. Stat. § 48.415(6) and in granting partial summary judgment without taking all the relevant evidence during the grounds phase. We must now determine whether the error was remedied and was harmless. To decide whether the error was remedied and was harmless, we turn to *Evelyn C.R. v. Tykila S.*, 2001 WI 110, 246 Wis. 2d 1, 629 N.W.2d 768, and *Waukesha County v. Steven H.*, 2000 WI 28, 233 Wis. 2d 344, 607 N.W.2d 607, in which a circuit court erred in not taking evidence at the grounds phase and the error was declared harmless error.

¶ 95. *Evelyn C.R.* and *Steven H.* differ from the instant case. In *Evelyn C.R.* the parent had defaulted;

577

in *Steven H.* the parent did not contest the petition. In both those two cases a sufficient evidentiary basis for a court's determination of unfitness rendered the circuit court's error in failing to take evidence at the grounds phase harmless. In contrast, in the instant case Bobby G. contested the petition and demanded a jury trial on the grounds for termination. In the instant case, the circuit court's error was not remedied and was not harmless for the reasons set forth below.

IV

■

¶ 96.   Even if the circuit court had taken evidence and considered Bobby G.'s post-termination petition efforts during the grounds phase or during the dispositional phase, neither the circuit court nor this court could decide whether the State had satisfied its burden under Wis. Stat. § 48.415(6). The facts to the extent they were developed and their import are in dispute. Accordingly, with material facts in dispute, the circuit court erred as a matter of law in granting partial summary judgment. Furthermore, Bobby G. had requested a jury trial, which the circuit court denied because it found no material facts in dispute. Neither the circuit court nor this court can deprive Bobby G. of his statutorily granted jury trial without justification. No justification exists in the present case. A jury should decide any dispute of facts or disputed inferences from the facts, not the circuit court or this court.

¶ 97.   In *Evelyn C.R.,* in which the parent had defaulted, we held that although the circuit court erred when it failed to take evidence at the fact-finding hearing to establish the grounds for the termination of parental rights by clear and convincing evidence, the

error was harmless.[39] The circuit court remedied the error by taking evidence at the dispositional phase of the termination of parental rights proceeding and then reconsidering its finding of the ground for termination on the basis of the new evidence presented. The facts were sufficient in *Evelyn C.R.* to support the circuit court's findings that grounds for termination existed. We explained our decision upholding the circuit court as follows:

> [T]he circuit court did not enter its order terminating Tykila's parental rights until after taking Evelyn's testimony and, based on this testimony, reaffirming its finding of abandonment. At the time the court reaffirmed its finding of abandonment and prior to the court ordering the termination of Tykila's parental rights, the record contained sufficient facts to support the circuit court's finding of abandonment.[40]

¶ 98. As was the case in *Evelyn C.R.*, the circuit court here received evidence relevant to the issue of the ground for termination at the dispositional stage of the termination proceedings. The circuit court took testimony from Bobby G. regarding his efforts to develop a relationship with his biological son after he learned about his son, that is, after the termination proceeding had begun. Bobby G.'s counsel introduced into evidence several of the letters that Bobby G. had written to

---

[39] Wisconsin Stat. § 805.18(2) provides in relevant part:

No judgment shall be reversed or set aside or new trial granted in any action or proceeding on the ground of ... error as to any matter of pleading or procedure, unless in the opinion of the court to which the application is made, after an examination of the entire action or proceeding, it shall appear that the error complained of has affected the substantial rights of the party seeking to reverse or set aside the judgment, or to secure a new trial.

[40] *Evelyn C.R.*, 246 Wis. 2d 1, ¶ 33.

caseworkers, which included inquiries about how to care for and contact his son. The foster father, Dr. Jeffrey, testified about the shoes and money order that he received from Bobby G. on Marquette's behalf. The circuit court also heard that Bobby G. had made several attempts to contact Denise W. while (unbeknownst to him) she was pregnant.

¶ 99. This evidence—which was not presented at the grounds phase of the termination proceeding—is relevant to whether Bobby G. failed to assume parental responsibility for Marquette. Unlike in *Evelyn C.R.,* however, in the present case the parent had not defaulted in the grounds phase and the circuit court did not reconsider and reaffirm its finding about the ground for termination on the basis of this adduced evidence.

¶ 100. Instead, the circuit court announced that "a great deal of the testimony that we took as it's [sic] relates to you today really isn't particularly relevant." The circuit court continued, "And, quite frankly, my listening to your description of the programming you're going through it sounds like, yeah, you have had a rough 10, 15 years, but it looks like things are finally coming together for you; starting to make the necessary decisions you have so that your life can turn around. And that is great. I hope it works out for you. But that is about you and this is about Marquette."

¶ 101. The circuit court did not find the new evidence relevant to the issue of the ground for termination. Because the statute requires the circuit court to consider evidence of Bobby G.'s conduct after the filing of the termination petition to assume parental responsibility for Marquette, we conclude that the circuit court erred in granting partial summary judgment and, unlike in *Evelyn C.R.,* that this error was not remedied at the dispositional phase.

¶ 102. In *Steven H.*,[41] the parent did not contest the petition and did not demand a jury trial. The *Steven H.* court examined the entire record of the termination of parental rights proceedings and "teased out" a factual basis to support the circuit court's finding of grounds for termination. In *Steven H.*, although the circuit court erred in failing to take testimony to support the allegations in the petition to terminate parental rights, "[a] factual basis for several of the allegations in the petition [could] be teased out of the testimony of other witnesses at other hearings when the entire record [was] examined."[42]

¶ 103. Even if we were to apply the command of the *Steven H.* court to "tease out" the factual basis from the relevant testimony when Bobby G. demanded a jury trial, we can only "tease out" from Bobby G.'s testimony that there was evidence, left largely unexplored by the parties, that Bobby G. was trying to assume parental responsibility for Marquette. At a proper fact-finding hearing, the extent and nature of those efforts could be examined. Only after a proper fact-finding hearing in which all of the relevant information about Bobby G.'s post-petition efforts to assume parental responsibility is presented could a jury determine whether grounds exist or could this court determine whether a directed verdict should be entered.

¶ 104. In the present case, Bobby G. was denied a jury trial guaranteed by statute. Wisconsin Stat. § 48.422(4) protects the right to a jury trial when a parent contests the petition for termination of parental rights. It provides in relevant part:

---

[41] *Waukesha County v. Steven H.*, 2000 WI 28, 233 Wis. 2d 344, 607 N.W.2d 607.

[42] *Id.*, ¶ 58.

Any party who is necessary to the proceeding or whose rights may be affected by an order terminating parental rights shall be granted a jury trial upon request if the request is made before the end of the initial hearing on the petition.

¶ 105. This statute is not the only reference to the right to a jury trial. Wisconsin Stat. § 48.424(2) directs that the fact-finding hearing be conducted according to Wis. Stat. § 48.31. Wisconsin Stat. § 48.31(2) governs fact-finding hearings in the Children's Code. It, too, emphasizes and protects the right to a jury trial, providing in relevant part:

The hearing shall be to the court unless the child, the child's parent, guardian, or legal custodian, the unborn child by the unborn child's guardian ad litem, or the expectant mother of the unborn child exercises the right to a jury trial by demanding a jury trial at any time before or during the plea hearing.

¶ 106. Wisconsin Stat. § 48.415 reiterates the role the jury plays in a fact-finding hearing on grounds for termination of parental rights, stating that "[a]t the fact-finding hearing the court or jury may make a finding that grounds exist for the termination of parental rights."

¶ 107. The circuit court erred in concluding that no material facts warranting a jury trial were in dispute. In doing so, the circuit court denied Bobby G.'s repeated requests for a jury trial. Disputed facts remain which should have been decided by a jury.

\* \* \* \*

¶ 108. We recognize that our decision unfortunately further extends the child's period of uncertainty. Nevertheless, the rights of both a parent and a child must be protected.

582

¶ 109. For the reasons set forth, we hold that in determining whether a party seeking termination of parental rights has proven by clear and convincing evidence that a biological father has failed to assume parental responsibility under Wis. Stat. § 48.415(6), a circuit court must consider the biological father's efforts undertaken after he discovers that he is the father but before the circuit court adjudicates the grounds of the termination proceeding. Thus the circuit court in the instant case proceeded under an erroneous interpretation of the statute. Furthermore, the facts were not fully developed, and the facts to the extent they were developed and their import are in dispute. The parties disputed whether Bobby G. assumed parental responsibility after he learned of his paternity but before adjudication of the grounds for termination. Accordingly, with facts in dispute, the circuit court erred as a matter of law in granting partial summary judgment. Moreover, Bobby G. requested a jury trial, which the circuit court denied because it erroneously found no material facts or inferences therefrom in dispute. Neither the circuit court nor this court can deprive Bobby G. of a jury trial by deciding the factual dispute.

¶ 110. Accordingly, we reverse the decision of the court of appeals and the summary judgment and remand the cause to the circuit court for a fact-finding hearing in accordance with Wis. Stat. § 48.424 to determine whether grounds exist for termination of Bobby G.'s parental rights to Marquette and, if necessary, for a dispositional hearing in accordance with § 48.427 on whether Bobby G.'s parental rights should be terminated in the best interests of Marquette.

*By the Court.*—The decision of the court of appeals is reversed.

¶ 111. JON P. WILCOX, J. (*dissenting*). Could a cocaine-pushing, woman-battering man, who does not even know about the existence of his child, have accepted and exercised "significant responsibility for the daily supervision, education, protection and care of the child"? Wis. Stat. § 48.415(6)(b) (2003–04).

¶ 112. If that is too close of a call, consider the same question, only the person admitted he never exercised responsibility for the daily supervision of the child, never exercised responsibility for the education of the child, never paid child support, and never met the child. Plus, he has been incarcerated for the vast majority of the child's life.

¶ 113. The circuit court answered no. Such a person has not assumed parental responsibility pursuant to Wis. Stat. § 48.415(6). The majority concludes the circuit court erred. "[T]he circuit court in the instant case proceeded under an erroneous interpretation of the statute" by failing to "consider the biological father's efforts undertaken after he discover[ed] that he is the father but before the circuit court adjudicate[d] the grounds of the termination proceeding." Majority op., ¶ 5.

¶ 114. The plain language of the Children's Code contradicts the majority's interpretation of § 48.415(6). Accordingly, I respectfully dissent.

I

¶ 115. Before addressing the analysis of the majority, it is necessary to supplement the facts presented by it.

¶ 116. Marquette was born on August 31, 2003. He was at least six weeks premature and weighed only four pounds and ten ounces. He had respiratory prob-

lems, including bronchiolitis, reactive airway disease, and pneumonia. From the hospital he was placed with foster parents, Dr. Jeffrey and Karen.

¶ 117. When Marquette was born, Bobby G. was facing charges for battering a woman. He was clueless about the existence of the child he had fathered as a result of his one and only face-to-face contact with Denise W. while not in state custody. Lest one conclude Bobby G. had no way of knowing the result of their volitional act, the State contacts fathers, such as Bobby G., if they register pursuant to Wis. Stat. § 48.025.[1] Wisconsin Stat. § 48.27(3)(b)1. provides that a person registered pursuant to § 48.025 receive notice of any CHIPS case involving their potential child.[2] However, Bobby G. never registered with the state. Any thought that he may have been ignorant to the potential of a

---

[1] Wisconsin Stat. § 48.025(1) states:

Any person claiming to be the father of a nonmarital child who is not adopted or whose parents do not subsequently intermarry under s. 767.60 may, in accordance with procedures under this section, file with the department a declaration of his interest in matters affecting such child.

[2] Wisconsin Stat. § 48.27(3)(b)1. provides the following:

Except as provided in subd. 2., if the petition that was filed relates to facts concerning a situation under s. 48.13 or a situation under s. 48.133 involving an expectant mother who is a child and if the child is a nonmarital child who is not adopted or whose parents do not subsequently intermarry as provided under s. 767.60 and if paternity has not been established, the court shall notify, under s. 48.273, all of the following persons:

a. A person who has filed a declaration of interest under s. 48.025.

b. A person alleged to the court to be the father of the child or who may, based on the statements of the mother or other information presented to the court, be the father of the child.

(Emphasis added.)

CHIPS case should be offset by the fact that Bobby G. already had his parental rights terminated to another child by the time he had face-to-face contact with Denise.

¶ 118. For the first six months of his life, Marquette's health problems required extensive treatment. He required treatment every two to three hours twenty-four hours a day, which his foster parents provided.

¶ 119. While Marquette endured his health problems, Bobby G. faced bail jumping charges. Despite a no contact order, Bobby G. went to the apartment of the woman he had battered a few months earlier. When he refused to leave, the woman contacted the police. The police persuaded him to leave. Within an hour, Bobby G. was back at the woman's apartment banging on the door. By his second visit, the police had discovered the existence of the no contact order.

¶ 120. In Spring 2004 Marquette's health condition got worse. He suffered a series of recurrent ear infections. He developed problems eating and maintaining his nutritional status. As a result of Marquette's condition, Dr. Jeffrey and Karen needed to administer treatment every hour and half to two hours twenty-four hours a day to maintain his hydration and nutrition. Marquette's condition got so bad that he had to be hospitalized for four days. Doctors found that food was going into his lungs and that he had multiple allergies. As they had done for Marquette since he arrived from the hospital days after his birth, his foster parents provided the necessary treatment and coordinated his numerous visits to doctors and therapists.

¶ 121. While Marquette was needing treatment at least 12 times a day, Bobby G. was facing charges for delivering cocaine. He was still oblivious to the exist-

ence of the child he had fathered. He received a maximum term of imprisonment of seven years and six months. The initial confinement in the Wisconsin Prison System was two years and six months and the extended supervision was five years.

¶ 122. In Summer 2004 the State filed a petition to terminate the parental rights of Marquette's parents, Denise W. and "Bobby." At the time the petition was filed, the identity of Marquette's father was unknown by Denise or the State. Denise misidentified Marquette's father twice before she suggested it may be "Bobby." The State used "Bobby" on the petition because Denise did not know Bobby G.'s last name. After genetic testing, Bobby G. was identified as Marquette's father.

¶ 123. In Fall 2004, only as a result of the State seeking out the identity of Marquette's father so it could terminate his parental rights, Bobby G. finally became aware that Marquette existed.

¶ 124. During the grounds phase of the termination proceedings, Bobby G. made a number of admissions. He admitted he never assumed parental responsibility for Marquette. He admitted he never established a substantial parental relationship with Marquette. He admitted he never exercised responsibility for the daily supervision of Marquette. He admitted he never exercised responsibility for the education of Marquette. He admitted he was unaware the he was the father of Marquette until after June 16, 2004, the date the State filed the petition to terminate his parental rights to Marquette. He admitted that he was not involved in assisting in, or providing for, the prenatal care of Marquette. He admitted that he never paid child support for Marquette. He admitted that he never met Marquette. He admitted that he was unaware that he

was the father of Marquette until he was informed of DNA test results indicating his paternity.

¶ 125. The State filed a motion for partial summary judgment, asserting that the undisputed facts entitled it to judgment as a matter of law that Bobby G. failed to assume parental responsibility pursuant to § 48.415(6). The circuit court granted the State's motion. Bobby G. filed a notice of appeal. The court of appeals accepted the no-merit report submitted by Bobby G.'s counsel.

## II

¶ 126. When a circuit court grants partial summary judgment, we review it independently applying the same methodology. *Oneida County Dep't. of Social Servs. v. Nicole W.,* 2007 WI 30, ¶ 8, 299 Wis. 2d 637, 728 N.W.2d 652. It is appropriate to grant summary judgment when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Id.* The majority deems summary judgment inappropriate in this case based on its flawed interpretation of § 48.415(6).

¶ 127. When multiple statutes in the same chapter relate to implementing the chapter's purpose, courts construe them to have a harmonized interpretation. *In re Angel Lace M.,* 184 Wis. 2d 492, 512, 516 N.W.2d 678 (1994).[3] The majority's interpretation of § 48.415(6) contradicts §§ 48.31(1) and 48.424. Rather than look to the statutes accompanying § 48.415(6) in the Children's Code for the proper definition of a fact-finding hearing, the majority provides a definition based on a contorted reading of the Children's Code.

---

[3] This canon of construction has been referred to as *in pari materia. In pari materia* means "[o]n the same subject; relating to the same matter." *Black's Law Dictionary* 794 (7th ed. 1999).

## A. A Harmonized Interpretation of the Children's Code Provisions

¶ 128. Reading §§ 48.31, 48.415, and 48.424 together, the scope of a § 48.415(6) fact-finding hearing is limited to the facts alleged in the petition to terminate. Facts that arise subsequent to the filing of the petition to terminate are not relevant to the fact-finder's determination of whether grounds exist to terminate the parent's parental rights.

¶ 129. Before enumerating the grounds for involuntary termination of parental rights, § 48.415 states that "[a]t the fact-finding hearing the court or jury may make a finding that grounds exist for the termination of parental rights." Wisconsin Stat. § 48.415(6) provides that one of the grounds for involuntary termination is the failure to assume parental responsibility.

¶ 130. The language of § 48.415 does not specify the particulars of the required fact-finding hearing. However, other provisions of the Children's Code do. Wisconsin Stat. § 48.424, like § 48.415, appears in Subchapter VIII of the Children's Code. Subchapter VIII relates to the termination of parental rights. Section 48.424(1) explicitly states that "[t]he purpose of the fact-finding hearing is to determine whether grounds exist for the termination of parental rights." Wisconsin Stat. § 48.424(2) provides that a "fact-finding hearing shall be conducted according to the procedure specified by s. 48.31."

¶ 131. Wisconsin Stat. § 48.31(1) defines a "fact-finding hearing" as "a hearing to determine if the allegations in . . . a petition to terminate parental rights are proved by clear and convincing evidence." From the plain language of the statute, the scope of a fact-finding

hearing is limited to those facts alleged in the petition to terminate parental rights.

¶ 132.  Applying the harmonized interpretation of the statutes to this case, no dispute of material fact existed when the circuit court granted the State's motion for partial summary judgment. Bobby G.'s own admissions establish that he never had the requisite substantial parental relationship required by § 48.415(6). The circuit court properly granted the State partial summary judgment.

B. The Majority's Flawed Interpretation

¶ 133.  In the face of the plain language of the Children's Code, the majority holds that circuit courts must consider a parent's efforts after the petition to terminate his or her rights has been filed. Majority op., ¶ 5. The majority provides seven reasons for its interpretation. Each reason enumerated lacks merit.

1. "Neglect" is Different than "Willful Neglect"

¶ 134.  The majority states that "Wis. Stat. § 48.415(6)(b) explicitly uses language that evidences the relevancy of whether a father knew or had reason to believe he was the father before the petition for termination of parental rights was filed." Majority op., ¶ 49. It focuses on the use of the words "neglected" and "refused," which both appear in one of the three factors circuit courts may consider pursuant to § 48.415(6)(b). The factor specifically reads, "whether the person has *neglected* or *refused* to provide care or support for the child." Wis. Stat. § 48.415(6)(b) (emphasis added). Based on *State v. Cissell,* 127 Wis. 2d 205, 225, 378 N.W.2d 691 (1985), the majority asserts that "[t]he word 'neglected' is not synonymous with negligence here." Majority op., ¶ 49.

590

¶ 135. The majority's reliance on *Cissell* is misplaced. *Cissell* involved the interpretation of a child support statute that used the term "willfully neglects."[4] The defendant argued that "willfully neglects" was internally inconsistent because "willful" means intentional and "neglect" means negligence. The *Cissell* court disagreed and held that the use of the term "willfully neglects" in Wis. Stat. § 52.05(1) did not render the statute void for vagueness.

¶ 136. Unlike *Cissell*, Wis. Stat. § 48.415(6) does not include the phrase "willfully neglects." It merely uses the word "neglect." Dismissing the distinction between a statute that uses the phrase "willfully neglects" and "neglect" undermines the majority's interpretation.

## 2. The Non-Exclusive Discretionary Factors

¶ 137. The majority's interpretation of § 48.415(6) depends on its interpretation of words found in non-exclusive discretionary factors. The plain language of the statute indicates that was not the legislature's intent.

¶ 138. Wisconsin Stat. § 48.415(6)(b) defines "substantial parental relationship" and provides a non-exclusive list of three factors the court may consider. Specifically, it states,

---

[4] Wisconsin Stat. § 52.05(1) (1981–82) states, in pertinent part, the following:

> Any person who deserts or <u>willfully neglects</u> or refuses to provide for the support and maintenance of his or her spouse or child under 18 years (legitimate or born out of wedlock) in destitute or necessitous circumstances shall be fined not more than $500 or imprisoned not more than 2 years or both. It is a defense to criminal liability that the person has just cause to desert, <u>willfully neglect</u> or refuse to provide support or maintenance.

(Emphasis added.)

> In evaluating whether the person has had a substantial parental relationship with the child, the court *may* consider such factors, including, but not limited to, (1) whether the person has ever expressed concern for or interest in the support, care or well-being of the child, (2) whether the person has neglected or refused to provide care or support for the child and (3) whether, with respect to a person who is or may be the father of the child, the person has ever expressed concern for or interest in the support, care or well-being of the mother during her pregnancy.

Wisconsin Stat. § 48.415(6)(b) (emphasis and numbering added). The majority even recognizes that § 48.415(6)(b) gives "non-exclusive examples of what a court *may* consider in evaluating whether the person has had a substantial parental relationship with the child." Majority op., ¶ 46 (emphasis added).

¶ 139. Nevertheless, in explaining its reasons for disregarding the State's harmonized interpretation of the Children's Code, the majority indicates that § 48.415(6) provides a list of elements that "must," or "have to," be satisfied. Majority op., ¶¶ 49, 52. In concluding its discussion of "neglected" and "refused," the majority states that "[a] circuit court therefore would *have to* take into account whether the father knew or had reason to believe he was the father." *Id.,* ¶ 49 (emphasis added). Why would a circuit court "have to" when the words "neglected" and "refused" appear in one of the non-exclusive list of factors "a court *may* consider?"

### 3. The Legislature Defined "Fact-Finding Hearing"

¶ 140. The introductory language of § 48.415 provides that "[a]t the fact-finding hearing the court or jury may make a finding that grounds exist for the termi-

nation of parental rights." Based on that, the majority concludes that "[t]his language does not require that the evidence regarding the grounds be limited to what has transpired as of the date of filing of the petition." Majority op., ¶ 53. This purportedly supports the majority's conclusion that circuit courts must consider evidence that arises from conduct after the filing of the petition to terminate parental rights.

¶ 141.  The majority's assessment makes sense only if the introductory language of § 48.415(6) is read in a vacuum. The legislature defined "fact-finding hearing" in §§ 48.31(1) and 48.424. As addressed above, § 48.31(1) does require that the evidence regarding the grounds be limited to conduct before the date of filing of the petition because it is proof of the "allegations in a petition" for which a fact-finding hearing is held.

## 4. Statutes are Primary Authority

¶ 142.  The majority proclaims that § 48.31(1) "does not support the State's position that the relevant cut-off date for evidence relating to the assumption of parental responsibility is the date the petition for termination is filed." Majority op., ¶ 54. Why? Because "[t]he State cites no support except a comment to the jury instruction Wis JI—Children 180." *Id.*

¶ 143.  The plain language of § 48.31(1) supports the State's position. Only by rejecting enactments of the legislature as primary authority does the majority's assessment of §§ 48.31(1) and 48.415(6) reach its erroneous conclusion.

## 5. The Purpose of the Children's Code

¶ 144.  The paramount goal of the Children's Code is to protect children. The majority quoted a portion of

§ 48.01(a), which is one of the many subsections that states the purpose of the Children's Code, as follows:

> While recognizing that the paramount goal of this chapter is to protect children and unborn children, to preserve the unity of the family, whenever appropriate, by strengthening family life through assisting parents and the expectant mothers of unborn children, whenever appropriate, in fulfilling their responsibilities as parents or expectant mothers.

(Emphasis added.) Family unity and strengthening family life are secondary goals that are furthered "whenever appropriate."

¶ 145. With the legislative purposes stated, the majority leaps to the conclusion that "[t]o effectuate the stated legislative purposes requires a circuit court, in determining whether grounds exist under § 48.415(6), to consider the efforts of a biological parent to assume parental responsibility after the filing of the termination of parental rights petition but before adjudication of the grounds for termination." Majority op., ¶ 62.

¶ 146. The legislature has provided evidence that the majority has failed to capture the essence of the Children's Code's purpose. Specifically, the legislature enacted § 48.31(1). Wisconsin Stat. § 48.31(1) explicitly limits the scope of a fact-finding hearing to facts alleged in the petition to terminate. Were the state able to terminate parental rights on allegations outside of the petition, the parent would not have notice of the allegations against him or her.

6. Participation Does Not Ensure that a Party Will Prevail

¶ 147. Regardless of its aversion toward other Children's Code statutes that define the scope of fact-

finding hearings, the majority claims that §§ 48.42(2)(b)2. and 48.422(6)(a) support its conclusion. However, an examination of the statutes indicates that neither contradicts the definition of fact-finding hearing provided by the legislature in § 48.31(1). Additionally, neither requires that a circuit court consider certain evidence at the fact-finding hearing.

¶ 148.   Wisconsin Stat. § 48.42(2) enumerates the parties that must be summoned when a petition for termination has been filed.[5] Therefore, Bobby G. had to be summoned when a petition was filed to terminate parental rights to Marquette. Wisconsin Stat. § 48.422(6)(a) provides that at a Wis. Stat. § 48.422 hearing a circuit court must ensure that all parties to the termination proceeding have been notified.[6]

---

[5] Wisconsin Stat. § 48.42(2)(b) provides the following:

(2) Who Must Be Summoned. Except as provided in sub. (2m), the petitioner shall cause the summons and petition to be served upon the following persons:

. . . .

(b) If the child is a nonmarital child who is not adopted or whose parents do not subsequently intermarry under s. 767.60 and paternity has not been established:

1. A person who has filed a declaration of interest under s. 48.025.

2. A person or persons alleged to the court to be the father of the child or who may, based upon the statements of the mother or other information presented to the court, be the father of the child unless that person has waived the right to notice under s. 48.41 (2)(c).

3. A person who has lived in a familial relationship with the child and who may be the father of the child.

[6] Wisconsin Stat. § 48.422(6)(a) provides the following:

595

¶ 149.   Neither §§ 48.42(2)(b)2. nor 48.422(6)(a) requires that a circuit court consider certain evidence at fact-finding hearings. Yet, the majority depends on these procedural statutes to determine the proper scope of fact-finding hearings. The majority does so in the face of the how the legislature has already defined fact-finding hearings in §§ 48.31(1) and 48.424.

7. A Legislative Theory

¶ 150.   The majority presents the convoluted history of § 48.415(6). Originally, the substantial parental relationship had to exist "prior to adjudication." Wis. Stat. § 48.415(6) (1979–80). Later, the substantial parental relationship had to exist prior to the "filing of the petition for termination of parental rights." Wis. Stat. § 48.415(6) (1989–90). In 1995, the legislature consolidated, renumbered, and amended § 48.415(6). Wis. Stat. § 48.415(6) (1995–96). Any reference to the temporal scope of the fact-finding hearing vanished. What does that mean?

¶ 151.   One theory is that the Joint Legislative Council's Special Committee, which addressed statutes throughout the Children's Code, realized it was repetitive to define the scope of a fact-finding hearing in § 48.31(1) and repeat a substantially similar definition in § 48.415(6). At the time, § 48.31(1) referred to "allegations in a ... petition to terminate parental rights" and § 48.415(6)(a)2. referenced a substantial parental

If the child is a nonmarital child who is not adopted or whose parents do not subsequently intermarry under s. 767.60 and paternity has not been established, the court shall hear testimony concerning the paternity of the child. Based on the testimony, the court shall determine whether all interested parties who are known have been notified under s. 48.42 (2). If not, the court shall adjourn the hearing and order appropriate notice to be given.

relationship "prior to the filing of a petition for termination of parental rights." In an effort to rid the statutes of some redundancy, the legislature may have deleted the language.

¶ 152. Of course, the role of courts is not to theorize about what the legislature may have been thinking. Courts interpret the laws as enacted by the legislature. When statutory language manifests a clear meaning, it is unnecessary to consult extrinsic sources to ascertain the legislature's intent, such as legislative history. *State ex rel. Kalal v. Cir. Ct. for Dane County,* 2004 WI 58, ¶ 46, 271 Wis. 2d 633, 681 N.W.2d 110. The rationale behind not delving into the convoluted legislative history in a case like this is that courts are "not at liberty to disregard the plain, clear words of the statute." *State v. Pratt,* 36 Wis. 2d 312, 317, 153 N.W.2d 18 (1967).

## III

¶ 153. Marquette should have been in a permanent home by now. His foster parents wanted to adopt him. The circuit court properly granted the State's motion for partial summary judgment. Bobby G. failed to assume parental responsibility. Nevertheless, instead of being in a permanent home, Marquette continues to be kept in limbo.

¶ 154. For the forgoing reasons, I respectfully dissent.

¶ 155. I am authorized to state that Justices DAVID T. PROSSER and PATIENCE DRAKE ROGGENSACK join this opinion.